In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4078

LUANN JAMES,

Plaintiff-Appellant,

v.

GENERAL MOTORS CORPORATION,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 97-C-1676--John D. Tinder, Judge.

Argued September 7, 2000--Decided October 16, 2000

Before BAUER, POSNER, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  LuAnn James wants us to determine that she was involuntarily terminated without cause from her employment. It is not our job to do that. This is a case arising under ERISA, the Employee Retirement Income Security Act of 1974 (29 U.S.C. sec.sec. 1132 et seq.), and the employee welfare benefit plan we are reviewing gave the plan administrator discretion to interpret its terms. So our role is limited. We may only determine whether the administrator interpreted the plan in an arbitrary or capricious manner when benefits were denied upon a finding that Ms. James "quit" her job.

James was an office worker, apparently an excellent one, for General Motors, first in Detroit and then in Indianapolis, for 19 years, from 1974 to 1993. In December 1993 GM sold the Allison Gas Turbine facility where James was working to the Allison Engine Company, which in turn was acquired by Rolls Royce. By accepting a job with AEC/Rolls, James was entitled for 3 years to certain continuing GM benefits. Plan documents said that she was not entitled to GM severance benefits if she voluntarily quit her position at AEC, but she would be entitled to GM severance benefits if she was terminated without cause by AEC during the 3-year period.

During the 3-year period, in December 1995, AEC

was sold to Electronic Data Systems, which at the time was a wholly owned, independently managed subsidiary of GM. James was offered employment with EDS, but she refused. To no avail, she asked to stay with AEC for lower pay. She asked AEC to let her interview for a job with GM. (To ask for permission was required under the terms of the 1993 sale from GM to AEC). Again, AEC refused.

James then sought severance benefits from GM, arguing that she had been involuntarily terminated from AEC without cause during the 3-year window. The severance benefits consist of a GM employment search or, if the search is unsuccessful, a 6-month separation allowance. GM denied the benefits, saying she was not entitled to anything because she quit. James filed the present suit. The district court granted GM's motion for summary judgment and James appeals.

As we have mentioned, GM's benefit plan was an "employee welfare plan" governed by ERISA. It gave GM the authority to determine eligibility for benefits and to construe provisions of the plan. Consequently, GM's interpretation may be reversed only if it was arbitrary or capricious. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Allison v. Dugan, 951 F.2d 828, 832 (7th Cir. 1992). We do not interfere with the plan administrator's decision unless he "not only made the wrong call, but . . . a 'downright unreasonable' one." Chojnacki v. Georgia Pacific Corp., 108 F.3d 810, 816 (7th Cir. 1997), quoting Fuller v. CBT Corp., 905 F.2d 1055, 1058 (7th Cir. 1990). A denial of benefits will not be set aside if it was based upon a reasonable interpretation of the plan documents. It does not matter whether the result reached by the administrator is one we would have arrived at in the first instance. Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998).

In other words, it is hard to overturn a decision of a plan administrator. And like many before her, James does not succeed. We find that the decision denying her benefits is neither arbitrary nor capricious.

When it sold its turbine facility to AEC, GM gave its employees a booklet titled "Your Benefits and Status as a General Motors Salaried Employee Following the Sale of Allison Gas Turbine Division." Page 4 of the booklet contains a template chart that indicates that salaried employees with 10 or more years of GM service at the time of the sale who "quit/terminated for cause within three years" would receive no separation allowance. However, employees "terminated by company (other than for cause) within three years" would receive placement in a

GM job or a separation allowance.

James argues that by declining to go to work for EDS she did not quit and was not terminated for cause, and thus deserves the severance benefits. GM argues that by refusing the EDS job, James voluntarily terminated her employment-- i.e., she quit--and thus is not entitled to severance benefits. This case, then, rests on how "quit" is defined. James contends that her situation does not fit the plain and ordinary meaning of "quit." And perhaps in some sense it does not. But neither does it seem that, in the ordinary meaning of the words, she was terminated. The terms as they are meant to be applied in the plan documents may not be self-defining in all situations, the one here for instance. That is precisely why GM's interpretation that James quit is not arbitrary and capricious. "When . . . the plan document does not furnish the answer to the question, the answer given by the plan administrator, when the plan vests him with discretion to interpret it, will ordinarily bind the court. That is implicit in the idea of deferential review of the plan administrator's interpretation." Ross v. Indiana State Teachers's Ass'n Ins. Trust, 159 F.3d 1001, 1010 (7th Cir. 1998), quoting Gallo v. Amoco Corp., 102 F.3d 918, 922 (7th Cir. 1996).

Furthermore, GM's interpretation is bolstered by its general employee handbook, called "Working with General Motors." That booklet says severance benefits were not applicable "for severance arising out of the sale of a GM unit where the employee continues, or is offered the opportunity to continue, employment with the buyer." The district court noted that the booklet defines quit as: "A separation is classified as a quit if: you resign from the Corporation and do not retire; or you do not report to work at the end of an approved leave of absence and in accordance with the leave; or you are on layoff status and do not accept a suitable offer of employment or training as specified by GM policy." This definition reinforces the conclusion that one quits if she does not accept a suitable offer of employment.

Nevertheless, James points out that people sometimes receive severance benefits from their old employer even if they have been offered a new job with a different employer. She points to Anstett v. Eagle-Picher Industries, Inc., 203 F.3d 501, 505-06 (7th Cir. 2000), in which Eagle-Picher's employees were immediately reemployed by the buyer of its plastics division. Eagle-Picher denied severance benefits, saying the spirit of its benefits package was to provide severance benefits for workers who lost their jobs. But the

company's benefits package said "[s]alaried employees terminated other than for cause or voluntary separation, due to the exigencies of the business situation, will be entitled" to severance benefits. At 502. Because the plan did not grant discretion to the administrator, we looked at it de novo and held Eagle-Picher to the letter of its benefits package: "[T]he plan draws no distinction between employees forced to go out and find other employment and employees who are re-hired by a purchaser, and we decline to write one into the policy." At 505. If Eagle-Picher employees received the benefits, why shouldn't she, says James. GM sees two reasons, with which we agree. First, Eagle-Picher's plan gave no discretionary authority to the administrator and thus our review of the situation was de novo, not deferential. Second, the wording of Eagle-Picher's plan was absolute; it granted severance benefits to anyone "terminated other than for cause." By contrast, GM's specific plan for the turbine workers was not so clear, and its general employee manual unambiguously denied severance benefits to workers who retained their jobs with successor companies after GM units were sold.

James' final argument that GM violated its fiduciary duty by denying severance benefits is without merit. A fiduciary duty in this context arises only when there is a failure to provide material information regarding the plan and the fiduciary's silence is misleading. Chojnacki. Accordingly, the decision of the district court is

AFFIRMED.